**UNITED STATES of America, Plaintiff,**

**v.**

**Morry WAKSBERG, M.D.,
et al., Defendants.**

**Civil Action No. 91–1531 (JLG).**

United States District Court,
District of Columbia.

Oct. 10, 1996.

---

William Mark Nebeker, Assistant United States Attorney, Washington, DC, for Plaintiff.

Robert N. Meals, Michael D. Helgren, Culp, Guterson & Grader, Seattle, WA, for Defendants.

*MEMORANDUM*

JUNE L. GREEN, District Judge.

## I. Introduction

This matter is before the Court on the Defendants' ("Dr. Waksberg") Application for an Award of Attorney Fees and Expenses Under the Equal Access to Justice Act ("EAJA"). Upon review of the record, the Court holds that the Government was not substantially justified in bringing this action against Dr. Waksberg and, therefore, Dr. Waksberg is entitled to costs, fees and other expenses under the EAJA. In addition, the Court finds no Government "bad faith," but it shall calculate the award of attorneys' fees using a cost of living adjustment.

## II. Statement of Facts

In the fall of 1988, attorneys for Dr. Waksberg commenced negotiations with federal prosecutors and the Office of the Inspector General ("OIG") of the Department of Health and Human Services ("HHS") concerning possible criminal and civil charges involving Medicare fraud. By the following year, the OIG settlement negotiator clearly understood that Dr. Waksberg was interested in resolving all civil and criminal charges in one "global" settlement.

Federal prosecutors agreed to offer Dr. Waksberg a pre-trial diversion settlement of the criminal matter ("Brooklyn Plan"). Implementation of the Brooklyn Plan was contingent upon Dr. Waksberg settling civil charges with the OIG.

Dr. Waksberg's attorneys also negotiated the terms of a Civil Settlement Agreement ("Agreement") that required Dr. Waksberg to pay to the OIG a sum of $648,935.72 and be voluntarily excluded from Medicare/Medicaid programs for two years. Progress Reports drafted by Vicki Roberts, one of the OIG's main investigators on the case, indicate that the Agreement was contingent upon Dr. Waksberg's signing the Brooklyn Plan.

On September 26, 1989, Dr. Waksberg signed the Agreement. Three days later, Ms. Eileen Boyd signed the Agreement on behalf of the government. Ms. Boyd knew that Dr. Waksberg's case was being negotiated as a global settlement and she was aware of the Brooklyn Plan.

The federal prosecutor who was in charge of coordinating the global settlement told officials at OIG to hold onto the Agreement until the Brooklyn Plan was signed by Dr. Waksberg. He also told OIG not to release a copy of the Agreement until then. Although Dr. Waksberg sought a copy of the Agreement, the OIG did not provide him with one until nine months after he signed it.

The OIG took no steps to enforce the provisions of the Agreement. Once settlement agreements are finalized, the OIG sends the documents to another division of HHS for processing and monitoring of payments and OIG sends out letters to Medicaid and Medicare stating that a person is excluded from those federal programs. OIG did not do so immediately after Dr. Waksberg signed the Agreement. Dr. Waksberg made no payments as required by the Agreement. In fact, the Medicaid carrier Transamerica paid Dr. Waksberg for services performed from September 1989 through March 1991.

Dr. Waksberg never signed the Brooklyn Plan. In June 1990, prosecutors decided not to bring a case against Dr. Waksberg.

After eight or nine months passed, a supervisor at OIG became aware of the Agreement after speaking with Dr. Waksberg's attorney. The OIG then endeavored to enforce it in June 1991.

After a brief trial before the Court, Dr. Waksberg prevailed. The Court found that ratification of the Brooklyn Plan was a condition precedent to the Agreement. Since Dr. Waksberg did not sign the Brooklyn Plan, the Government could not enforce the terms of the Agreement.

## III.  Discussion

### A.  28 U.S.C. § 2412(d)(1)(A) (1994)

■ The Equal Access to Justice Act provides the following:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A) (1994). The position of the United States is "substantially justified" if it is "justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988). The Court must apply this standard to the Government action that prompts the litigation and to the Government's conduct of the litigation. 28 U.S.C. § 2412(d)(2)(D) (1994).

The Government has the burden of proving that its position was substantially justified. *Lundin v. Mecham*, 980 F.2d 1450, 1459 (D.C.Cir.1992). "[O]nce a private litigant has met the multiple conditions for eligibility for EAJA fees, the district court's task of determining what fee is reasonable is essentially the same as that described in *Hensley.*" *Commissioner, Immigration and Naturalization Service v. Jean*, 496 U.S. 154, 161, 110 S.Ct. 2316, 2320, 110 L.Ed.2d 134 (1990).

In its brief, the Government tries to justify its case in three distinct areas: the evidence supporting the original allegations against Dr. Waksberg; the argument for excluding parol evidence and the case against Dr. Waksberg after the introduction of parol evidence. This case, however, was brought to enforce an agreement and, therefore, any discussion of Dr. Waksberg's potential liability for Medicare fraud is irrelevant.

Upon reviewing the evidence of record, the Court concludes that the Government was not substantially justified in attempting to enforce the Agreement. Furthermore, the Government cannot overcome this deficiency by a nearly exclusive focus on the narrow evidentiary issue involving parol evidence.

The evidence demonstrates the absence of an enforceable settlement because the Agreement was always contingent upon ratification of the Brooklyn Plan. Lengthy negotiations, progress reports of one of the OIG's main investigators on the case and the OIG's failure to implement the Agreement all demonstrate this. OIG's refusal to provide Dr. Waksberg with a copy of the Agreement immediately and the continuing federal reimbursements provide additional proof. In the face of this evidence, the Government was not substantially justified in trying to enforce the Agreement.[1]

### B.  Bad Faith

■ Under the "American Rule", "the prevailing litigant is ordinarily not entitled to

---

1. In its Opposition, the Government contested fee requests for travel time and for work done on the following issues: sovereign immunity from contempt damages, the Government's Motion for Sanctions and Dr. Waksberg's case against Transamerica. Upon review of the Supplemental Declaration of Robert N. Meals in Support of Defendants' Application for an Award of Attorney's Fees and Expenses Under the Equal Access to Justice Act, the Court is satisfied that Dr. Waksberg's downward adjustments adequately address the Government's concerns. Furthermore, the Court holds that the hours spent drafting a complaint on behalf of Dr. Waksberg and the 3.4 hours spent by Mr. Meals on December 6, 1991 are reasonable under the EAJA.

collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616–17, 44 L.Ed.2d 141 (1975). An exception to this general rule permits a court to assess attorney's fees for "willful disobedience of a court order" or when "the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 258–59, 95 S.Ct. at 1622. Attorneys' fees will be awarded only when "extraordinary circumstances or dominating reasons of fairness so demand." *Nepera Chemical, Inc. v. Sea-Land Service, Inc.,* 794 F.2d 688, 702 (D.C.Cir.1986). "[A]dvocacy simply for the sake of burdening an opponent with unnecessary expenditures of time and effort clearly warrants recompense for the extra outlays attributable thereto." *Lipsig v. National Student Marketing Corp.,* 663 F.2d 178, 181 (D.C.Cir.1980).

Under the EAJA, the United States government is subject to the "bad faith" exception to the American Rule. 28 U.S.C. § 2412(b) (1994). Although the Court cannot conclude that the Government's case was substantially justified, neither can it conclude that the Government brought this case in order to burden Dr. Waksberg with unnecessary expenditures of time and effort. The record demonstrates a pattern of bureaucratic bungling and a failure to assess accurately the legal validity of the Agreement. This does not amount to bad faith litigation.

### C. Cost of Living Adjustment

Attorneys' fees under the EAJA may be modified by a cost of living adjustment. 28 U.S.C. § 2412(d)(2)(A) (1994). Such an adjustment is appropriate in this case. The adjustment is measured from 1981, the year in which the EAJA took effect. *Wilkett v. I.C.C.,* 844 F.2d 867, 874 (D.C.Cir.1988). Furthermore, the adjustment is ordinarily made to the year in which services were rendered as opposed to the year in which the fee application is made. *Id.* at 875. Under the "special factor" criterion of the EAJA, however, courts may calculate the cost of living adjustment to the year of the fee application in order to compensate for delay. *Id.*

at 876; *Hirschey v. F.E.R.C.,* 777 F.2d 1, 5 (D.C.Cir.1985).

In many instances, Dr. Waksberg is seeking fees for services rendered three to five years ago. Part of the reason for the delay can be attributed to litigation of the government's contempt and the death of Judge Revercomb which occurred after the first trial but before a decision on the merits. It is equitable to recognize this "unusual" delay as a special factor under the EAJA. *See Oklahoma Aerotronics, Inc. v. United States,* 943 F.2d 1344, 1350 (D.C.Cir.1991) (holding that unusual delay attributable to judiciary is EAJA "special factor.").

This Circuit calculates cost of living adjustments using the U.S. Department of Labor Consumer Price Index. *See Wilkett v. I.C.C.,* 844 F.2d at 875; *Jones v. Lujan,* 887 F.2d 1096, 1101 n. 8 (D.C.Cir.1989). Using the increase in the Consumer Price Index between passage of the EAJA and the date upon which the underlying litigation was finished (May 1995), Dr. Waksberg arrives at an adjusted attorneys' fees figure of $124.36 an hour. (Supp.Decl. Robert Meals Ex. C.) The Court, therefore, shall use this figure as the hourly rate in calculating attorneys' fees in this case.

Dr. Waksberg's attorneys worked 1,226.2 hours on this case. Using a rate of $124.36 per hour, the Court calculates an award of attorneys' fees of $152,490.23.

### D. Special Factors under 28 U.S.C. § 2412(d)(2)(A).

An award of attorneys' fees under the EAJA may also exceed the $75.00 statutory cap in order to account for a "special factor, such as the limited availability of qualified attorneys for the proceedings involved[.]" 28 U.S.C. § 2412(d)(2)(A) (1994). This factor refers to attorneys who are "'qualified for the proceedings' in some specialized sense, rather than just in their general legal competence." *Pierce v. Underwood,* 487 U.S. at 572, 108 S.Ct. at 2554. The attorney must demonstrate "some distinctive knowledge or specialized skill needful for the litigation in question—as opposed to an extraordinary

level of the general lawyerly knowledge and ability useful in all litigation." *Id.*

Dr. Waksberg argues that Robert Meals, Esq. has gained an expertise in litigating cases against the OIG that includes a familiarity with the agency, its internal procedures, applicable statutes and regulations. (Supp.Decl. ¶ 4.)

The Court finds that Mr. Meals provided Dr. Waksberg with an outstanding level of legal representation, but not the type of specialized assistance envisioned by the EAJA.

### E. Paralegal Fees

This Circuit has affirmed the award of paralegal fees under the EAJA. *See Oklahoma Aerotronics, Inc. v. United States,* 943 F.2d at 1352 (upholding award of paralegal time as "expenses"); *Raton Gas Transmission Co. v. F.E.R.C.,* 891 F.2d 323, 329 n. 75 (D.C.Cir.1989) (approving of reasonable compensation for legal assistants such as paralegals). In analyzing another fee-shifting statute, the Supreme Court viewed it as "self-evident" that a statutory " 'reasonable attorney's fee' ... should compensate the work of paralegals." *Missouri v. Jenkins,* 491 U.S. 274, 285, 109 S.Ct. 2463, 2470, 105 L.Ed.2d 229 (1989) (interpreting 42 U.S.C. § 1988). Whether the award under the EAJA is justified as a "reasonable attorney fee" or a necessary "project" expense, *see* § 2412(d)(2)(A), Dr. Waksberg shall be reimbursed for paralegal work in the amount of $19,923.90.

### F. Costs

The EAJA entitles prevailing parties to costs as enumerated under 28 U.S.C. § 1920 (1994). 28 U.S.C. § 2412(a)(1) (1994). The Court shall, therefore, award Dr. Waksberg $14,530.13 as reimbursement for the costs of this case.

### IV. Conclusion

The Government was not substantially justified in bringing this action against Dr. Waksberg and, therefore, Dr. Waksberg is entitled to costs, fees and other expenses under the EAJA. Since the Government did not bring this action in "bad faith," the Court does not award attorneys' fees at the market rate. The Court does, however, calculate the fees using a cost of living adjustment. Consequently, Dr. Waksberg is entitled to attorneys' fees in the amount of $152,490.23; paralegal fees of $19,923.90 and $14,530.13 in costs. The sum total of this award is $186,944.26.